SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Andre Higgs** **(A-28-21) (085863)**

**Argued October 24, 2022 -- Decided March 30, 2023**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

In this appeal, the Court considers several rulings related to discovery and the admissibility of evidence arising from defendant Andre Higgs's trial for the murder of Latrena May.

Defendant and May had been involved in a romantic relationship and shared a child. On the evening of May's death, defendant and May were arguing on her front porch when East Orange Police Officer Kemon Lee approached them after hearing a woman's voice shout "police" several times while he patrolled the area.

Officer Lee testified that shortly after exiting his patrol car, he asked May to come down from the porch, but defendant began shooting May. Officer Lee returned fire and shot defendant several times. Defendant testified to a different version of events. Defendant stated that May pulled out a gun during their argument, and defendant took the gun away from her. According to defendant, he tried to surrender as Officer Lee approached, but the officer fired his weapon at defendant which led to the involuntary discharge of the gun in defendant's hand, causing May's death.

Prior to trial, defendant sought access to Officer Lee's internal affairs file, which included prior incidents of the officer firing his weapon while on duty. Defendant argued that the prior incidents were relevant to his defense that Officer Lee fired first. The trial court denied access to the file. The State then sought to bar defendant from cross-examining Officer Lee about any prior shootings and the trial court granted the State's motion. Lastly, the State sought to impeach defendant on cross-examination with his prior indictable convictions. Four judgments of conviction were over 20 years old at the time of trial (including convictions for aggravated assault, weapon possession, and CDS distribution and possession), and one (for weapon possession) was over 14 years old. The trial court granted the State's request, finding that a disorderly persons offense seven years prior to the trial was sufficient to "bridge the gap" between the old convictions and the present matter.

1

At trial, video from Officer Lee's dashcam was played for the jury during the testimony of Officer Lee, defendant, and Detective Kevin Green, who was not present at the scene of the shooting. Detective Green testified, over objection, that he believed the dashcam footage depicted a gun in defendant's back waistband as Officer Lee's patrol car approached.

Defendant was convicted of murder, among other offenses, and sentenced to life imprisonment. On appeal, the Appellate Division affirmed defendant's convictions and sentence, finding no error with the trial court's rulings.

The Court granted certification, 248 N.J. 595 (2021), on the three issues raised in defendant's petition: (1) whether the trial court erred in not allowing defendant access to Officer Lee's internal affairs records and not allowing defense counsel to cross-examine Officer Lee regarding his prior on-duty shootings; (2) whether it was error pursuant to N.J.R.E. 701 to allow the lay opinion testimony of Detective Green regarding the image on the dashcam video; and (3) whether defendant's remote convictions were improperly admitted for impeachment purposes.

**HELD:** The Court reverses as to all three issues and remands for a new trial. The Court prescribes a framework for trial courts to assess requests for access to internal affairs records and provides guidance for the application of that framework on remand in this case. Because the defense argues Officer Lee discharged his firearm first, defense counsel could potentially be allowed to explore Officer Lee's history of past shootings on cross-examination. On remand, defendant will be entitled to access the internal affairs file as outlined in the Court's opinion, and that evidence may be used to cross-examine Officer Lee subject to any objections pursuant to N.J.R.E. 403 or 404(b). Detective Green's testimony was based entirely on his lay opinion from watching the video, which was impermissible under N.J.R.E. 701. The video was already in evidence, so the jury was able to view the video and determine for themselves what the video showed. Finally, applying the factors in N.J.R.E. 609(b)(2), it was error for the trial court to admit defendant's remote convictions because the State did not meet its burden of establishing that the probative value outweighed the prejudicial effect of admitting the old convictions.

1. The Court reviews the rules and case law governing discovery in criminal cases to determine whether they require the disclosure of police internal affairs records to a criminal defendant in pretrial discovery. The Court also takes note that, in 1991, the Attorney General, pursuant to statutory authority, adopted the Internal Affairs Policy and Procedures (IAPP) which established a comprehensive set of procedures to address complaints of police misconduct. The IAPP carries the force of law for State and local law enforcement. In 1996, the Legislature passed N.J.S.A. 40A:14-181, which requires all law enforcement agencies to "adopt and implement

guidelines which shall be consistent with the guidelines governing the [IAPP]." Each iteration of the IAPP has addressed the confidentiality of the disciplinary process and detailed the limited circumstances in which the records of an internal affairs investigation could be released. The current IAPP allows for disclosure in certain limited circumstances -- for example, at the direction of the county prosecutor or the Attorney General, or pursuant to a court order. In 2020, in a significant shift in practice, the Attorney General mandated the public identification of all officers subject to "major discipline," which includes termination, a reduction in rank, or a suspension of more than five days. Even more recently, the Court held that although internal affairs records are exempt from disclosure under the Open Public Records Act, those records can and should be disclosed under the common law right of access when interests that favor disclosure outweigh concerns for confidentiality. (pp. 22-27)

2. In the present case, defendant sought access to Officer Lee's internal affairs file to support defendant's theory that Officer Lee fired his firearm first, which led defendant to involuntarily fire the gun in his hand. Defendant was denied that access after the trial court conducted an in camera review and determined that the records were not relevant to the case. To ensure that defendants in criminal trials are provided with the discovery necessary to adequately prepare for trial, defendants must be allowed, under certain circumstances, to access documents in law enforcement's internal affairs files. That does not, however, mean that defendants should have unbridled access to internal affairs records. To appropriately balance the important interests involved, the Court adopts the following procedure:

Going forward, a defendant who seeks discovery of information from an internal affairs file must first file a motion with the trial court requesting an in camera review of that file. The motion shall identify the specific category of information the defendant seeks and the relevance of that information to the defendant's case. A general allegation that the defendant is in search of information relevant to a law enforcement officer's credibility for impeachment purposes would be insufficient to obtain review of the file. In order for a trial court to grant a motion to conduct an in camera review of an internal affairs file, the defendant must point to a specific category or type of evidence and assert that the evidence, if present in the file, has a relevant nexus to an issue in the case. The Court anticipates that many defendants will be in a position to meet the relevancy standard and declines to adopt the more stringent "peculiar evidence" standard articulated over two decades ago in State v. Harris, 316 N.J. Super. 384 (App. Div. 1998). If the trial court determines as a threshold matter that the requested information, if present in the internal affairs file, would be relevant to the defendant's case -- for impeachment purposes or to support the defense's theory, for example -- the trial court shall grant the defendant's motion and conduct an in camera review of the internal affairs records outside the presence of the parties. The in camera review by the trial court

3

would be <u>solely</u> for the purpose of determining whether the category of identified information exists in the internal affairs file. If, upon review, the trial court determines that the requested information is present in the file, both parties shall be allowed to review the <u>relevant</u> portion of the file, subject to any protective orders entered by the trial court. If the evidence sought is present in the file and relevant to the case, the court must balance its relevance against potential undue prejudice, as required in N.J.R.E. 403, prior to allowing that evidence in at trial. The Court provides additional guidance, including as to the application of the new framework in this case. (pp. 27-32)

3. The Confrontation Clause protects a defendant's right to cross-examine a witness on the possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand, subject to oversight by trial courts under N.J.R.E. 611(a). The denial of effective cross-examination when it should have been allowed would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it. Here, because the defense argues Officer Lee discharged his firearm first, defense counsel could potentially be allowed to explore Officer Lee's history of past shootings on cross-examination. On remand, defendant will be entitled to access the internal affairs file as outlined in the Court's opinion, and that evidence may be used to cross-examine Officer Lee subject to any objections pursuant to N.J.R.E. 403 or 404(b). (pp. 32-35)

4. N.J.R.E. 701 directs that "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." The Court reviews cases in which it has addressed the admission of lay opinion testimony by law enforcement officers when identifying defendants in videos or photographs presented to the jury. In <u>State v. Sanchez</u>, the Court adopted the following four factors for courts to consider when deciding whether to admit lay opinion identification testimony: (1) "the nature, duration, and timing of the witness's contacts" with the subject of the testimony; (2) any change in the subject's appearance since the time of the events at issue; (3) the availability of other witnesses; and (4) the quality of the photographic or video evidence about which the witness is testifying. 247 N.J. 450, 470-73 (2021). No single factor is dispositive, and the factors are "not exclusive" -- "other considerations may be relevant to the question of whether lay opinion testimony will assist the jury in a given case." <u>Id.</u> at 473-74. (pp. 35-38)

5. In this case, Detective Green testified to a portion of the dashcam video that briefly showed defendant on the front porch of the home prior to the shooting. The video is dark and difficult to perceive. At one point in the video, as Officer Lee approached the house, the overhead lights on his patrol car briefly illuminated defendant and an item appeared to be visible in defendant's back waistband.

4

Detective Green testified, over defense counsel's objection, that the item appeared to be a firearm based on his 27 years of law enforcement experience. Detective Green's lay opinion testimony thus directly contradicted defendant's testimony that the gun was in his hand and in front of his body when Officer Lee arrived. Detective Green was not testifying as an expert witness despite his years of law enforcement experience. The State did not attempt to qualify him as an expert witness and did not introduce evidence about his qualifications to permit him to testify as an expert. His testimony was based entirely on his lay opinion from watching the video, which was impermissible under N.J.R.E. 701. Detective Green's testimony invaded the province of the jury by usurping the jury's assessment of the image in the video. The Court does not rule out the possibility of allowing a law enforcement officer to testify about a sequence in a video that is complex or particularly difficult to perceive, but the video in this case was not overly complex and did not involve a lot of activity or a chaotic scene that the jury needed assistance viewing. (pp. 38-41)

6. The Court reviews the history of the rules governing the admission of prior convictions. In determining whether evidence of a conviction that occurred over 10 years prior to the start of trial is admissible under N.J.R.E. 609(b)(1), courts may consider "(i) whether there are intervening convictions for crimes or offenses, and if so, the number, nature, and seriousness of those crimes or offenses, (ii) whether the conviction involved a crime of dishonesty, lack of veracity or fraud, (iii) how remote the conviction is in time, [and] (iv) the seriousness of the crime." N.J.R.E. 609(b)(2) (emphases added). Through amendments to the rule, a concern about using disorderly persons offenses to "bridge the gap" to a conviction older than 10 years was addressed by shifting the burden of admission onto the proponent of the remote convictions. (pp. 41-44)

7. Here, the State argued that defendant's June 2009 disorderly persons offense was sufficient to "bridge the gap" and admit defendant's 24- and 14-year-old convictions. The only intervening offense since defendant's last conviction in 2003 was a single disorderly persons offense that was not serious in nature and did not involve a lack of veracity. Further, the prior convictions did not involve "dishonesty, lack of veracity, or fraud." See N.J.R.E. 609(b)(2)(ii). The seriousness of the prior convictions is not disputed, but it is not the only inquiry and cannot alone outweigh the prejudicial impact of remote convictions that have nothing to do with dishonesty. It was error to admit the remote convictions. (pp. 44-47)

**REVERSED and REMANDED for a new trial.**

**CHIEF JUSTICE RABNER; JUSTICES PATTERSON, SOLOMON, WAINER APTER, and FASCIALE; and JUDGE SABATINO (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion.**

5

SUPREME COURT OF NEW JERSEY

A-28 September Term 2021

085863

State of New Jersey,

Plaintiff-Respondent,

v.

Andre Higgs,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division

| Argued | Decided |
|--------|---------|
| October 24, 2022 | March 30, 2023 |

John J. McMahon argued the cause for appellant (Law Office of John J. McMahon, attorneys; John J. McMahon, of counsel and on the briefs, and Lois De Julio, on the briefs).

Matthew E. Hanley, Special Deputy Attorney General/Acting Assistant Prosecutor argued the cause for respondent (Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney; Matthew E. Hanley, of counsel and on the briefs).

Michael R. Noveck, Assistant Deputy Public Defender, argued the cause for amicus curiae Public Defender of New Jersey (Joseph E. Krakora, Public Defender, attorney; Michael R. Noveck, of counsel and on the briefs).

Dillon Reisman argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Dillon Reisman, Jeanne LoCicero, and Alexander Shalom, on the brief).

CJ Griffin argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin and Chanel J. Hudson, on the brief).

Sundeep Iyer, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Alec Schierenbeck, Deputy State Solicitor, and Steven K. Cuttonaro, Deputy Attorney General, of counsel and on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

In this appeal, we are asked to determine whether to uphold several trial court rulings. Defendant Andre Higgs was convicted of murder after a jury trial. Defendant and the decedent, Latrena May, had been involved in a romantic relationship and shared a child. On the evening of May's death, defendant and May were arguing on her front porch when East Orange Police Officer Kemon Lee approached them after hearing a woman's voice shout "police" several times while he patrolled the area.

Officer Lee testified that shortly after exiting his patrol car, he asked May to come down from the porch, but defendant began shooting May.

2

Officer Lee returned fire and shot defendant several times. Defendant testified to a different version of events. Defendant stated that May pulled out a gun during their argument, and defendant took the gun away from her. According to defendant, he tried to surrender as Officer Lee approached, but the officer fired his weapon at defendant which led to the involuntary discharge of the gun in defendant's hand, causing May's death.

Prior to trial, defendant sought access to Officer Lee's internal affairs file, which included prior incidents of the officer firing his weapon while on duty. Defendant argued that the prior incidents were relevant to his defense that Officer Lee fired first. The trial court denied access to the file. The State then sought to bar defendant from cross-examining Officer Lee about any prior shootings and the trial court granted the State's motion. Lastly, the State sought to impeach defendant on cross-examination with his five prior judgments of conviction; four were over 20 years old at the time of trial and one was over 14 years old. The trial court granted the State's request, finding that a disorderly persons offense seven years prior to the trial was sufficient to "bridge the gap" between the old convictions and the present matter.

At trial, video from Officer Lee's dashcam was played for the jury during the testimony of Officer Lee, defendant, and Detective Kevin Green, who was not present at the scene of the shooting. Detective Green testified,

3

over objection, that he believed the dashcam footage depicted a gun in defendant's back waistband as Officer Lee's patrol car approached.

Defendant was convicted of murder, among other offenses, and sentenced to life imprisonment. On appeal, the Appellate Division affirmed defendant's convictions and sentence, finding no error with the trial court's rulings.

We granted certification on the three issues raised in defendant's petition: (1) whether the trial court erred in not allowing defendant access to Officer Lee's internal affairs records and not allowing defense counsel to cross-examine Officer Lee regarding his prior on-duty shootings; (2) whether it was error pursuant to N.J.R.E. 701 to allow the lay opinion testimony of Detective Green regarding the image on the dashcam video; and (3) whether defendant's remote convictions were improperly admitted for impeachment purposes.

As detailed below, we now reverse on all three issues and remand the matter for a new trial.

I.

A.

We rely on the testimony from defendant's trial for the following summary.

4

According to defendant, he met and began dating Latrena May in 2007. Although defendant was in a long-term relationship with another woman at the time, defendant and May continued their relationship and had a daughter, D.H., in 2011. D.H. primarily resided with May, and defendant testified that he gave May money from time to time to support their daughter and May's household, but there were no court orders in place regarding child support or visitation. Ten months before May's death, May and D.H. moved into an apartment in East Orange that May leased from defendant, who owned the property.

Defendant testified that on May 1, 2015, May called defendant and asked him to stop by her residence to drop off money and to talk. Defendant stated that he arrived at May's residence at approximately 10:00 p.m. Defendant said he gave May $350 and the two talked in her bedroom as May sat on her bed watching television. Defendant testified that May was upset because she wanted defendant to leave his fiancée and be in a relationship with May. At some point, defendant told May that she and D.H. should move out of the apartment at the end of the lease term. According to defendant, May became very upset, pulled a gun out from under her pillow, and told defendant that he was "going to cause her to do something to [defendant]." Defendant took those words as an "idle threat" and told May he was leaving.

5

Defendant testified that he walked out of the bedroom and May followed him onto the front porch of the house wearing only underwear and a halter top. According to defendant, once on the porch, he "[g]rabbed the weapon out of [May's] hand" because he believed "[May] was doing something very stupid." What occurred next is the subject of disputed testimony.

Defendant's Version

Defendant claims that when he and May were on the porch, he did not notice Officer Lee's police car, but May attempted to alert him to the officer's presence by saying "police" several times. Defendant testified that after he saw the police car turn on the overhead lights and make a U-turn, May wanted to go back into the house, but he told May to stand still in hopes of not attracting the officer's attention. As the police car approached, defendant said he tried to hide May behind him due to her state of undress and told her to stay calm.

As Officer Lee's patrol car approached, the vehicle's dashcam was recording. At one point, the car's overhead lights briefly illuminated defendant standing on the porch. Defendant claims that at that time his back was facing the police car and the gun was in his hand, in front of his body, between him and May.

6

Defendant testified that "[Officer Lee] was reaching for his gun the minute he was trying to get out of the car . . . . [H]e was basically grabbing his gun before he was out of the seat." Defendant stated that after Officer Lee exited his patrol vehicle and before he approached defendant and May, May yelled to Officer Lee to "stop." Defendant testified that he tried to talk to Officer Lee to explain the situation and yelled, "my man, you ain't going to believe this." By then, Officer Lee was in front of his car and said, "I'm not your M-ing F-ing man, come down here." Defendant stated that he then tried to alert Officer Lee that he had a gun in his hand and took a "surrendering position" with his hands up and the gun "point[ing] up, straight up." Defendant testified that Officer Lee began shooting at that moment. When defendant heard the shot, he claims he tried pushing May out of the way and then he "went black" and felt like he had been "beat with a sledgehammer."

A total of four bullets struck defendant's legs. It is undisputed that May was fatally struck by three bullets that came from the firearm in defendant's hand. Defendant testified that after he was shot by Officer Lee, the gun in his hand went off but he "[didn't] remember pulling the trigger." Defendant stated that the shooting was "involuntary."

After being shot, defendant "pushed [himself] back into the hallway" of the home on his buttocks and maneuvered back into the foyer where he threw

7

the gun over his left shoulder in order to "get the gun as far away from [him] as possible." Defendant testified that he never hid the gun and did not know where the gun landed exactly. Defendant then woke up his daughter D.H., told her to go upstairs, and yelled to the second-floor tenant Reshanda Richmond to let D.H. in. Defendant testified that after he heard officers tell him to come out of the house over a loudspeaker, he tried to communicate with the police by yelling that he could not walk and that the front door was unlocked. Defendant eventually pushed himself towards the front door and opened it. When officers entered the house, they found defendant lying across the threshold of the door on his stomach with his hands stretched out. Officers arrested defendant without incident.

### Officer Lee's Testimony

Officer Lee testified that while on patrol on May 1, 2015, at approximately 10:15 p.m., he heard a woman's voice screaming "officer" approximately four to six times and observed the woman outside on a porch. Officer Lee turned on his marked patrol car's overhead lights, made a U-turn, and stopped in front of the porch. As he approached, Officer Lee saw May "standing at the top of the stairs" and defendant standing "really close to [May] with very little space in between them." Officer Lee exited his vehicle

8

and testified that he did not notice the gun in defendant's hand until defendant shot May.

Officer Lee stated that when he approached the porch, he "already unholstered [his gun]," which was "in [his] right hand, pointed toward the ground with [his] finger off of the trigger and on the slide."[1] Officer Lee stated that as he was approaching the porch, neither defendant nor May said anything to him. Officer Lee testified that with his left hand he "ordered the female to come down," but before she could do so, defendant "pulled out a gun and started to shoot [May]." Officer Lee testified that defendant shot May "at least twice," and immediately thereafter, Officer Lee shot the defendant several times.

Testimony of Other Witnesses

Reshanda Richmond, her son, and Joseph Jackson lived in the second-floor apartment of the same house as May. Richmond testified that at approximately 10:15 p.m., right before the gunshots, she heard arguing and a commotion outside. When she looked out the window, she saw the police, May, and defendant, whom she referred to as her landlord. According to

---

[1] When other officers arrived at the scene, Officer Lee first told a supervisor that he did not draw his weapon until he saw defendant shoot May. During the internal affairs investigation interview, when Officer Lee saw the conflicting dashcam video footage for the first time, Officer Lee seemed surprised that he had his gun out when he initially exited his vehicle.

Richmond, she heard May say "[c]all the police." Richmond recalled hearing May yell for the police more than once. Richmond testified that she heard defendant say "[t]hat's my man" and Officer Lee respond, "I'm not your man." Jackson testified that on the day of the shooting, before hearing the gunshots, he heard a female voice yelling outside. After the yelling and prior to the shooting, Jackson heard the female say "No, stop."

Juliet Kerr also testified at trial. Kerr lived on the second floor of the building next to May's residence. Kerr also overheard arguing and "loud talking" between a male and female prior to the shooting. When Kerr looked out of her window, she saw a police car and a woman standing near the doorway in her underwear and bra. Kerr testified that as the officer approached, May spoke to the officer and said "stop."

## B.

On November 6, 2015, an Essex County grand jury returned a seven-count indictment charging defendant with first-degree murder, third-degree aggravated assault, second-degree unlawful possession of a handgun, second-degree possession of a firearm for an unlawful purpose, second-degree endangering the welfare of a child, third-degree hindering apprehension, and third-degree possession of a controlled dangerous substance. On the same day,

10

a separate indictment charged defendant with first-degree unlawful possession of a weapon and possession of a weapon by a convicted felon.

Prior to trial, the defense made discovery requests that included information from the New Jersey State Police Office of Professional Standards that pertained to the manner in which officers seized evidence during the investigation. Through the information provided in response to that request, defendant learned of Officer Lee's prior on-duty shootings. Defense counsel later moved for discovery of Officer Lee's internal affairs file, arguing that the file was "crucial to the defendant's ability to thoroughly and properly cross examine [Officer Lee]." The trial court granted the motion out of "an abundance of caution" and noted that "in fairness to [defendant] . . . I want to at least take an in camera look to see if there would be anything that would be appropriate for the defense to have, since he is, I think we all agree, [Officer Lee] would be the primary witness here."

Thereafter, the trial judge reported that he had completed the in camera review of the internal affairs file and determined that there was nothing relevant in the file that should be turned over to defendant.

The State then filed a motion in limine to prevent defendant from cross-examining Officer Lee about prior shootings that occurred while he was on-duty. Defendant opposed the motion and sought permission from the court to

11

ask Officer Lee whether he had been the subject of 22 prior internal affairs investigations or complaints, in order to challenge the officer's credibility and bias. The trial court granted the State's motion and denied defendant's request to question Officer Lee about the prior shootings and the internal affairs investigations. The court found that the prior shootings were not relevant and there was no basis for believing the prior shootings would impact Officer Lee's behavior absent a medical diagnosis of post-traumatic stress disorder. The trial court prohibited defense counsel from mentioning Officer Lee's prior shootings.

## C.

The State also filed a pretrial motion seeking to impeach defendant with his prior indictable convictions pursuant to N.J.R.E. 609(b)(2), in the event he testified at trial. Of the five prior judgments of conviction, four had the same sentence date of February 16, 1993.[2] The fifth judgment related to a January 17, 2003 conviction for third-degree unlawful possession of a weapon resulting in a sentence of eighteen months' probation.

---

[2] The judgments included convictions for second-degree aggravated assault; second-degree possession of a weapon for an unlawful purpose; third-degree distribution of CDS within 1,000 feet of a school zone; and second-degree possession of CDS.

12

In assessing the factors under N.J.R.E. 609(b)(2) to determine the admissibility of defendant's convictions, which were all more than 10 years old at the time of trial, the trial court first noted that defendant's previous convictions were for serious offenses but were also remote and not for crimes involving dishonesty. Initially, the court acknowledged that standing alone, the remoteness of the convictions favored exclusion. The court determined, however, that defendant's 2009 disorderly persons offense for simple assault "bridged the gap" between the present case and defendant's prior convictions. In admitting all of defendant's prior convictions, the court emphasized the effect of the intervening 2009 disorderly persons offense, opining that, had it not occurred, the court likely would have excluded the past convictions.

D.

During trial, Detective Kevin Green of the Essex County Prosecutor's Office Homicide Task Force testified about the investigation he conducted on the night of the shooting in his capacity as the lead detective in the case. The dashcam video from that evening was already in evidence and had been played for the jury during Officer Lee's testimony. The State played the video again during Detective Green's testimony as he walked the jury through what transpired that evening. At one point during Detective Green's testimony, the prosecutor stopped the video, and the following colloquy ensued:

13

PROSECUTOR:  What do you see in black right here where I'm pointing on the screen?

DETECTIVE GREEN:  It appears to be a firearm.

DEFENSE COUNSEL:  Objection.  Judge, that's absolutely impossible to determine.

THE COURT:  Let me come down and just -- so I can make it an open/closed ruling.

At this point, it appears the parties discussed the objection with the judge outside of the jury's ability to hear the discussion.

DEFENSE COUNSEL:  You know [defendant] is wearing a cell phone clip.  There is no way you can say you know what that is.

DETECTIVE GREEN:  That appears to be a firearm.

DEFENSE COUNSEL:  I appreciate that this witness wants to say that . . . .

. . . .

DEFENSE COUNSEL:  This is an opinion.  It is not a fact.  The witness can't offer an opinion.  I mean, we can all look at the image and form our own opinions at the end of this case.

. . . .

DEFENSE COUNSEL:  It's [a] basic principle of evidentiary rules.  We can't offer an opinion unless he's an expert.

THE COURT:  Well, first of all, the detective has said that he's seen this video many times.  He did the investigation, obviously.  The video, sort of, speaks for

14

itself.  The jury will have the video.  They can see it for themselves and make whatever determination they feel is appropriate.

It's not inappropriate for Detective Green to be able to view the video and give his opinion, just like he gave his opinion that he could see people on the top of the steps, the vehicle . . . he can offer opinion.  Whether or not the jury finds that opinion to be credible or not is up to the jury to make a call.  So I'll permit the question because the jury is going to have the video.  They can see it for themselves, but I'll permit it.

Detective Green's testimony then resumed:

PROSECUTOR:  Describe to me why it looks to you like that was a firearm?

. . . .

DEFENSE COUNSEL: Objection. Judge, you just said it speaks for itself.

THE COURT:  I said he could give his opinion and now the prosecutor is asking for the basis of the opinion, which I think would go hand in hand, so I'll permit that too.

. . . .

DETECTIVE GREEN:  In my [27 years of] experience, I've seen firearms in waistbands in the . . . location where it is.  In that location, to me, that appears to be a firearm.

On direct examination, defendant testified that the image on the dashcam video -- that Detective Green believed was a firearm -- was not a firearm.

Defendant stated that the gun, at the point in time captured in the video, was in

15

his hand, in front of his body, between defendant and May, contrary to Detective Green's testimony.

## E.

At the conclusion of the first phase of defendant's bifurcated trial, the jury found defendant guilty of first-degree murder, third-degree aggravated assault, and charges related to unlawful possession and use of a handgun. The jury found defendant not guilty of second-degree endangering the welfare of a child. In the second phase, the jury convicted defendant of unlawful possession of a weapon and possession of a weapon by a convicted felon.

The trial court sentenced defendant to an aggregate term of life imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

## F.

On appeal, defendant made numerous arguments challenging his convictions and sentence. In an unpublished opinion, the Appellate Division rejected defendant's arguments and affirmed his convictions and sentence. With regard to the issues currently before this Court, the Appellate Division rejected defendant's arguments without discussion.

16

## G.

Defendant petitioned this Court for certification on three issues: (1) whether the trial court erred in denying defendant access to Officer Lee's internal affairs file and not allowing defense counsel to cross-examine Officer Lee about his prior shootings in the line of duty; (2) whether Detective Green should have been allowed to provide his lay opinion regarding the dashcam video footage; and (3) whether the trial court abused its discretion in allowing defendant to be impeached on his remote prior convictions. We granted defendant's petition on all three issues. 248 N.J. 595 (2021).

We also granted the applications of the American Civil Liberties Union of New Jersey (ACLU), the New Jersey Office of the Public Defender, the Association of Criminal Defense Lawyers of New Jersey (ACDL), and the Attorney General of New Jersey to participate as amici curiae.

## II.

## A.

Defendant argues that the trial court erred in denying him access to Officer Lee's internal affairs file. Defendant reasons such evidence of prior on-duty shootings would tend to discredit Officer Lee's testimony and support defendant's theory that Officer Lee fired first. Defendant further asserts that his right of confrontation was improperly limited when he was not allowed

17

cross-examination on the officer's prior on-duty shootings and other internal affairs investigations. Next, defendant argues that Detective Green's lay opinion identifying what he believed to be a gun in defendant's waistband on the dashcam footage substantially prejudiced him such that he was denied a fair trial. Defendant argues that Detective Green's opinion -- formed by after-the-fact viewing of the video -- fails to meet N.J.R.E. 701's requirement that lay testimony be based on firsthand sensory perception and usurps the power of the jury. Finally, defendant contends that the trial court abused its discretion by allowing the State to impeach him with his remote convictions under N.J.R.E. 609(b)(2)(i), because his lone seven-and-one-half-year-old disorderly persons adjudication does not form the pattern of criminal activity required to bridge the gap between the present case and the old convictions.

Several amici support defendant's contentions. The ACLU and ACDL particularly emphasize the importance of access to internal affairs records to a defendant's right to confrontation. The ACLU urges this Court to implement a standard that grants defendants presumptive access to relevant internal affairs records so that defendants can effectively cross-examine law enforcement witnesses. The ACDL adds that the Appellate Division decision in State v. Kareem Harris, 316 N.J. Super. 384 (App. Div. 1998), which requires "peculiar relevance" for a defendant to access internal affairs records, places

18

too difficult a burden on defendants by requiring them to "somehow identify the specific contents of a secret file that [they have] never even seen as a prerequisite to gaining access to that file."

The Office of the Public Defender argues that defendant's well-founded allegation that Officer Lee was the aggressor was sufficient to obtain access to Officer Lee's internal affairs records and overcome the need to keep some internal affairs records confidential. The Public Defender urges the Court to allow defense counsel's presence during the in camera review of internal affairs records and cross-examination into any conduct bearing on a law enforcement witness's credibility. The Public Defender also echoes defendant's arguments that Detective Green's testimony was inadmissible under N.J.R.E. 701 and that the trial court erred in allowing defendant to be impeached on his remote convictions.

B.

The State urges this Court to defer to the trial court's decision to preclude cross-examination of Officer Lee regarding prior shootings after its in camera review of the internal affairs file. The State argues that those shootings should not come in because they were deemed justified and because they do not have any peculiar relevance under the Kareem Harris standard. The State further asserts that Detective Green's opinion is either a permissible

19

lay opinion under N.J.R.E. 701 because Detective Green viewed the footage using his senses and formed an opinion helpful to the jury, or as a permissible expert opinion under N.J.R.E. 702, based on his "specialized knowledge" obtained from years of experience in law enforcement dealing with weapons. Finally, the State argues that the seriousness of defendant's offenses in the present case justified the trial court's use of defendant's recent criminal history to "bridge the gap" to his remote convictions.

The Attorney General, appearing as amicus curiae, takes no position on the outcome of the case but makes limited arguments regarding defendant's access to internal affairs files and his ability to cross-examine Officer Lee on his prior shootings. The Attorney General argues that the Confrontation Clause is not a discovery tool, so whether defendant is entitled to access internal affairs files is an issue that must be analyzed instead under the Court's discovery rules and jurisprudence. Specifically, the Attorney General suggests that in order for a defendant to obtain internal affairs records that are not provided as part of the State's discovery disclosure, the defendant can identify a specific type of information that might be contained in internal affairs records and the specific basis -- in light of the facts of the case -- for disclosure of such information. The Attorney General reasons that this standard properly ensures a defendant access to necessary information while disallowing any

20

attempts to engage in a "haphazard search" for information not rooted in either the facts of the case or the parties' theories of guilt or innocence.

The Attorney General maintains that a defendant need not make a preliminary showing that the record actually contains the information he demands, but should have to make a threshold showing of the information's relevance to justify in camera examination by the trial court. Additionally, the Attorney General notes that trial courts can use redactions, protective orders, and other measures to safeguard confidential and sensitive information contained in material evidence to be disclosed.

The Attorney General takes no position regarding the trial court's decision to bar defendant from cross-examining Officer Lee about his prior on-duty shootings. The Attorney General notes that trial courts retain wide latitude to limit the scope of cross-examination but concedes that there may be circumstances in which the limitations placed on cross-examination give rise to potential violations of the Confrontation Clause.

## III.

In this appeal, we must review several of the trial judge's evidentiary rulings. We first determine whether defendant was entitled to review Officer Lee's internal affairs file and whether defense counsel should have been

21

allowed to cross-examine the officer regarding his past shootings and internal affairs investigations.

A.

We begin with the issue of access to the internal affairs file. This Court reviews trial court discovery orders for an abuse of discretion. State v. Hernandez, 225 N.J. 451, 461 (2016). Appellate courts "should generally defer to a trial court's resolution of a discovery matter, provided its determination is not so wide of the mark or is not based on a mistaken understanding of the applicable law." State in Int. of A.B., 219 N.J. 542, 554 (2014) (quotation omitted). Trial judges are given "considerable latitude" when deciding whether to admit evidence. State v. Jackson, 243 N.J. 52, 65 (2020) (quoting State v. Nelson, 173 N.J. 417, 470 (2002)). "We do not substitute our own judgment for the trial court's unless its ruling was so wide of the mark that a manifest denial of justice resulted." State v. Medina, 242 N.J. 397, 412 (2020) (quotation omitted).

1.

In order to ensure just and fair proceedings, our court rules have "adopted an open-file approach to pretrial discovery in criminal matters post-indictment." State v. Scoles, 214 N.J. 236, 252 (2013); see also State v. Ramirez, 252 N.J. 277, 295 (2022). "Our Evidence Rules generally promote

22

admissibility of all relevant evidence, N.J.R.E. 402, and 'evince a more expansive approach to the admission of evidence.'" State v. Derrick Harris, 209 N.J. 431, 439 (2012) (quoting State v. Muhammad, 359 N.J. Super. 361, 388 (App. Div. 2003)). Notwithstanding how "expansive our discovery rule and jurisprudence may be, they do not sanction rummaging through irrelevant evidence." Hernandez, 225 N.J. at 463.

Evidence is relevant under New Jersey Rule of Evidence 401 if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Relevant evidence, however, may nevertheless be excluded pursuant to N.J.R.E. 403 "if its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence."

The State's obligation to produce exculpatory and impeachment evidence is prescribed in Rule 3:13-3(b)(1), which governs post-indictment discovery. Rule 3:13-3(b)(1) provides that discovery "shall include exculpatory information or material." That rule codifies the standards set forth decades ago by the United States Supreme Court in Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972).

23

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In State v. Brown, this Court acknowledged that

> [t]hree essential elements must be considered to determine whether a Brady violation has occurred: (1) the evidence at issue must be favorable to the accused, either as exculpatory or impeachment evidence; (2) the State must have suppressed the evidence, either purposely or inadvertently; and (3) the evidence must be material to the defendant's case.
>
> [236 N.J. 497, 518 (2019).]

In Giglio, the Supreme Court expanded Brady's scope to encompass evidence that can be used to impeach government witnesses. 405 U.S. at 153-54. The Court held that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." Id. at 154 (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)). Though a new trial is not automatically required if the evidence is "not likely to have changed the verdict," the materiality element of Brady is met if there is "any reasonable likelihood [the evidence would] have affected the judgment of the jury." Ibid. (quotations omitted).

24

2.

In this appeal, we determine when the above-referenced principles require the disclosure of police internal affairs records to a criminal defendant in pretrial discovery.

In 1991, the Attorney General, pursuant to statutory authority, adopted the Internal Affairs Policy and Procedures (IAPP) which established a comprehensive set of procedures to address complaints of police misconduct. Rivera v. Union Cnty. Prosecutor's Off., 250 N.J. 124, 142 (2022); see also In re Att'y Gen. Directive, 246 N.J. 462, 482-86 (2021) (providing a comprehensive summary of the history of the IAPP and Attorney General Directives regarding internal affairs files).

This Court has recognized that the IAPP carries the "force of law for State and local law enforcement." In re Att'y Gen. Directive, 246 N.J. at 487-88; see, e.g., Paff v. Ocean Cnty. Prosecutor's Off., 235 N.J. 1, 20-21 (2018) (finding that a local police chief's general order does not carry the force of law, unlike guidelines, directives, and policies issued by the Attorney General); N. Jersey Media Grp., Inc. v. Township of Lyndhurst, 229 N.J. 541, 565 (2017) (concluding that the Attorney General's Use of Force Policy has "the force of law for police entities" (quotation omitted)). In 1996, the Legislature passed N.J.S.A. 40A:14-181, which requires all law enforcement

25

agencies to "adopt and implement guidelines which shall be consistent with the guidelines governing the [IAPP]."

Under the IAPP, the "nature and source of internal allegations, the progress of internal affairs investigations, and the resulting materials are confidential information." See 2020 IAPP at 56. Since 1991, "[e]ach iteration of the IAPP has addressed the confidentiality of the disciplinary process" and detailed the limited circumstances in which the records of an internal affairs investigation could be released. In re Att'y Gen. Directive, 246 N.J. at 483-84. "The current IAPP allows for disclosure in certain limited circumstances -- for example, at the direction of the county prosecutor or the Attorney General, or pursuant to a court order." Rivera, 250 N.J. at 142.

In 2020, in a significant shift in practice, the Attorney General issued Directives 2020-5 and 2020-6, which mandated the public identification of all officers subject to "major discipline," which includes termination, a reduction in rank, or a suspension of more than five days. See Attorney General, Directive Requiring Public Disclosure of the Identities of Officers Who Commit Serious Disciplinary Violations (June 15, 2020) (Directive 2020-5); Attorney General, Directive Requiring Public Disclosure of the Identities of Department's Officers Who Committed Serious Disciplinary Violations Since 2000 (June 19, 2020) (Directive 2020-6). This Court recently upheld the

26

Attorney General's authority to issue those Directives. In re Att'y Gen. Directive, 246 N.J. at 482-86.

Even more recently, this Court held that although internal affairs records are exempt from disclosure under the Open Public Records Act, "those records can and should be disclosed under the common law right of access when interests that favor disclosure outweigh concerns for confidentiality." Rivera, 250 N.J. at 135. To assess whether the interest in transparency favors disclosure, "the parties should present more than generalized, conclusory statements." Id. at 149 (citing Paff, 235 N.J. at 28). Detailed arguments about the admissibility of police records enable judges to conduct the delicate balancing of factors presented in Rivera and Loigman v. Kimmelman, 102 N.J. 98, 108 (1986). See id. at 144, 148-49.

### 3.

In the present case, defendant sought access to Officer Lee's internal affairs file to support defendant's theory that Officer Lee fired his firearm first, which led defendant to involuntarily fire the gun in his hand. Defendant was denied that access after the trial court conducted an in camera review and determined that the records were not relevant to the case.

To ensure that defendants in criminal trials are provided with the discovery necessary to adequately prepare for trial, defendants must be

allowed, under certain circumstances, to access documents in law enforcement's internal affairs files. This is consistent with the State's obligation to produce exculpatory and impeachment evidence, as the Attorney General has conceded in this matter. That does not, however, mean that defendants should have unbridled access to internal affairs records. To appropriately balance the important interests involved, we adopt the following procedure.

Going forward, a defendant who seeks discovery of information from an internal affairs file must first file a motion with the trial court requesting an in camera review of that file. The motion shall identify the specific category of information the defendant seeks and the relevance of that information to the defendant's case. A general allegation that the defendant is in search of information relevant to a law enforcement officer's credibility for impeachment purposes would be insufficient to obtain review of the file. The procedure should not be a fishing expedition into the disciplinary records of law enforcement.

An allegation that the information, if present, is relevant to the case is necessary for a defendant to obtain the trial court's in camera review of the file. "Relevancy consists of probative value and materiality." State v. Buckley, 216 N.J. 249, 261 (2013); accord 1 McCormick on Evidence § 185

(8th ed. 2022) ("There are two components to relevant evidence: materiality and probative value."). Probative value is "the tendency of evidence to establish the proposition that it is offered to prove." McCormick § 185; accord State v. Garron, 177 N.J. 147, 167 n.2 (2003). "Materiality concerns the fit between the evidence and the case" and "looks to the relation between the proposition that the evidence is offered to prove and the issues in the case." McCormick § 185; see also State v. Williams, 240 N.J. 225, 236 (2019) ("Necessarily, for evidence to be relevant, it must also be material."). N.J.R.E. 401 incorporates those two concepts in defining relevant evidence as having "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." Evidence that is "'of consequence' is material, and evidence that affects the probability that a fact is as a party claims it to be has probative force." McCormick § 185. So, in order for a trial court to grant a motion to conduct an in camera review of an internal affairs file, the defendant must point to a specific category or type of evidence and assert that the evidence, if present in the file, has a relevant nexus to an issue in the case.

We anticipate that many defendants will be in a position to meet the relevancy standard and decline to adopt the more stringent "peculiar evidence" standard articulated over two decades ago in Kareem Harris, 316 N.J. Super. at 384. Much has changed since that 1998 decision. See In re Att'y Gen.

29

Directive, 246 N.J. at 496; see also Rivera, 250 N.J. at 135. At a time when the Attorney General's Directives have signaled a massive shift in policy regarding the confidentiality of internal affairs records and this Court has held that the general public, under certain circumstances, can obtain internal affairs files through the common law right of access, there is no logical reason why criminal defendants, whose life and liberty are at stake, should have less access to those records than the general public.

If the trial court determines as a threshold matter that the requested information, if present in the internal affairs file, would be relevant to the defendant's case -- for impeachment purposes or to support the defense's theory, for example -- the trial court shall grant the defendant's motion and conduct an in camera review of the internal affairs records outside the presence of the parties. The in camera review by the trial court would be solely for the purpose of determining whether the category of identified information exists in the internal affairs file. If, upon review, the trial court determines that the requested information is present in the file, both parties shall be allowed to review the relevant portion of the file, subject to any protective orders entered by the trial court.

Allowing the parties access to the relevant portion of the internal affairs file is not, however, the end of the inquiry. Even if the evidence sought is

present in the file and relevant to the case, the court must balance its relevance against potential undue prejudice, as required in N.J.R.E. 403, prior to allowing that evidence in at trial.

4.

The present matter illustrates how this procedure would work in practice. For example, it would have been sufficient for defendant here to move for the trial court to conduct an in camera review to determine whether Officer Lee's internal affairs file contains any information regarding the officer's involvement in prior on-duty shootings. As defendant has argued, such information could be relevant to his defense theory that Officer Lee shot first, thereby causing the gun in defendant's hand to misfire. Defendant has also argued that the information on prior shootings is relevant to Officer Lee's credibility and bias. Those representations would be sufficient for a trial court to grant the motion and conduct an in camera review to determine whether Officer Lee's internal affairs file contains any information regarding past shootings.

Based on the record, we know that Officer Lee's internal affairs file does in fact contain information regarding prior on-duty shootings that defendant has alleged is relevant to his defense. As a result, the parties must be given access on remand to the portion of the file related to those prior shootings,

31

subject to any protective orders entered by the court.[3]  The trial court must then determine whether that evidence is admissible at trial pursuant to N.J.R.E. 403.

B.

We turn next to the second question arising from Officer Lee's personnel records:  whether the defense should have been allowed to cross-examine Officer Lee about the prior shootings.  We review decisions about the permissible scope of cross-examination for abuse of discretion.  State v. Silva, 131 N.J. 438, 449 (1993).

1.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI; see also Ohio v. Clark, 576 U.S. 237, 243 (2015).  Article I, Paragraph 10 of the New Jersey Constitution provides the same guarantee in identical language to an accused in a criminal trial.  See N.J. Const. art. I, ¶ 10.  "The main and essential purpose of confrontation is to

---

[3]  Defendant has not, at this stage, made a showing that he is entitled to access information on all 22 of Officer Lee's internal affairs investigations, so we do not find that he is entitled to information regarding those files.  On remand, defendant is not precluded from making an argument, pursuant to the procedure outlined in this opinion, that another specific type or category of information in the internal affairs file would be relevant to this case.

secure for the opponent the opportunity of cross-examination." Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (emphasis omitted) (quoting 5 Wigmore on Evidence § 1395, at 123 (3d ed. 1940)).

The Confrontation Clause protects a defendant's right to cross-examine a witness on the "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" Id. at 316 (quoting 3A Wigmore § 940, at 775 (Chadbourn rev. 1970)). Defendants "must be afforded the opportunity through effective cross-examination to show bias on the part of adverse state witnesses." State v. Sugar, 100 N.J. 214, 230 (1985).

The right to cross-examine for bias, "however, is not absolute, and may, in appropriate circumstances, bow to competing interests." State v. Budis, 125 N.J. 519, 531 (1991). Our evidence rules instruct trial courts to "exercise reasonable control over the mode and order of interrogating witnesses" to ensure a proceeding is "effective for determining the truth," to "avoid wasting time," and to "protect witnesses from harassment or undue embarrassment." N.J.R.E. 611(a).

Nevertheless, the denial of effective cross-examination when it should have been allowed "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." Davis, 415 U.S. at 318 (quoting Smith v. Illinois, 390 U.S. 129, 131 (1968)); see also Sugar, 100 N.J. at 230 (noting that the right to test for bias through cross-examination "is a right of constitutional dimensions").

2.

The State filed a pretrial motion seeking a ruling prohibiting defendant from cross-examining Officer Lee about his two prior on-duty shootings. Defendant argued that the past shootings were relevant because they (1) could show that a third shooting by the officer would have exposed him to yet another internal affairs investigation and possible discipline, which could show the officer's bias in presenting the facts in a certain manner; and (2) could inform the jury about Officer Lee's state of mind on the night in question and support defendant's contention that Officer Lee prematurely fired his weapon first. Defendant further argues that Officer Lee's bias and motive to potentially lie after having endured two prior investigations for on-duty shootings is evident in Officer Lee's initial statement to internal affairs that he did not draw his weapon until he witnessed defendant shoot May, a fact that was easily disproved by the dashcam video.

34

This is an unusual case because the testifying officer's prior actions are relevant to defendant's asserted defense. Here, because defendant's defense is that Officer Lee discharged his firearm first, defense counsel could potentially be allowed to explore Officer Lee's history of past shootings on cross-examination. On remand, defendant will be entitled to access the internal affairs file as outlined above, and that evidence may be used to cross-examine Officer Lee subject to any objections pursuant to N.J.R.E. 403 or 404(b).

IV.

We next determine whether Detective Green's testimony about the dashcam video regarding what he believed to be a gun in defendant's waistband was properly admitted pursuant to N.J.R.E. 701. We review the trial court's determination to allow that testimony for an abuse of discretion. See State v. Sanchez, 247 N.J. 450, 465-66 (2021).

A.

N.J.R.E. 701 governs the admission of lay witness testimony. The rule directs that "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. Lay witness testimony is distinct from expert testimony, which may be allowed "[i]f

35

scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.J.R.E. 702.

"The first prong of N.J.R.E. 701 requires [that] the witness's opinion testimony . . . be based on the witness's 'perception,' which 'rests on the acquisition of knowledge through the use of one's sense of touch, taste, sight, smell or hearing.'" State v. Singh, 245 N.J. 1, 14 (2021) (quoting State v. McLean, 205 N.J. 438, 457 (2011)). "The second requirement of N.J.R.E. 701 is that lay witness opinion testimony be 'limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue.'" Id. at 15 (quoting McLean, 205 N.J. at 458).

In recent years, this Court has addressed the admission of lay opinion testimony by law enforcement officers when identifying defendants in videos or photographs presented to the jury. In State v. Lazo, this Court ruled that it was improper for a non-eyewitness detective to testify that a photo of the defendant resembled a composite sketch of the suspect. 209 N.J. 9, 12 (2012). We held that N.J.R.E. 701 required the detective to have personal familiarity with the defendant's appearance before rendering such an opinion. Id. at 22-24.

In Singh, the trial court allowed a detective to testify that the sneakers seen in video surveillance footage were similar to those he personally observed the defendant wearing at the time he was arrested. 245 N.J. at 4-5. The video, as well as the sneakers, were in evidence and available to the jury. Id. at 19-20. A divided Court held that because the detective "had first-hand knowledge of what the sneakers looked like, having seen them on [the] defendant" when he was apprehended, the detective's "lay witness opinion as to the similarities between the sneakers from the surveillance footage and the sneakers he saw that night was rationally based on his perception." Id. at 19-20.

In Sanchez, the trial court barred the defendant's parole officer from offering a lay opinion identifying the defendant in a still photograph from a surveillance video. 247 N.J. at 458. The parole officer had met with the defendant more than 30 times in the 15 months prior to seeing the "Attempt to Locate" flyer in which she identified the defendant. Id. at 458, 460-61. This Court reversed, finding that the parole officer's "identification of defendant as the front-seat passenger in the surveillance photograph was 'rationally based on [her] perception,' as N.J.R.E. 701 requires." Id. at 469 (alteration in original). Because the parole officer "became familiar with defendant's appearance by meeting with him on more than thirty occasions," we concluded that her "contacts with [the] defendant were more than sufficient to enable her

to identify him in the surveillance photograph more accurately than a jury could." Id. at 469, 474.

Also, in Sanchez, we adopted the following four factors for courts to consider when deciding whether to admit lay opinion identification testimony: (1) "the nature, duration, and timing of the witness's contacts" with the subject of the testimony; (2) any change in the subject's appearance since the time of the events at issue; (3) the availability of other witnesses; and (4) the quality of the photographic or video evidence about which the witness is testifying. Id. at 470-73. No single factor is dispositive, and the factors are "not exclusive" -- "other considerations may be relevant to the question of whether lay opinion testimony will assist the jury in a given case." Id. at 473-74.

## B.

In this case, Detective Green testified to a portion of the dashcam video that briefly showed defendant on the front porch of the home prior to the shooting. The video is dark and difficult to perceive. At one point in the video, as Officer Lee approached the house, the overhead lights on his patrol car briefly illuminated defendant and an item appeared to be visible in defendant's back waistband. Detective Green testified, over defense counsel's objection, that the item appeared to be a firearm based on his 27 years of law enforcement experience.

38

The State argues that the location of the gun was not an important issue in this case because defendant admitted to having the gun in his possession on the front porch. That is incorrect. The location of the gun when Officer Lee arrived on scene was an important part of the defense, which is presumably why the State asked Detective Green to opine as to where he believed the gun was in the critical moments before the shooting. Detective Green's lay opinion testimony that the video showed a gun in defendant's back waistband directly contradicted defendant's testimony that the gun was in his hand and in front of his body when Officer Lee arrived.

Detective Green was not testifying as an expert witness despite his years of law enforcement experience. The State did not attempt to qualify him as an expert witness and did not introduce evidence about his qualifications to permit him to testify as an expert.

In addition, he based his opinion solely on watching the video. In <u>Singh</u>, the officer was at the scene of the defendant's arrest and saw the shoes in question on defendant's feet that evening. 245 N.J. at 19. In <u>Sanchez</u>, the parole officer had met with the defendant 30 times and was therefore capable of identifying the defendant in a photograph. 247 N.J. at 474. In both of those cases, the testimony was based on the witness's actual perception of the defendant or the piece of evidence in question.

Here, Detective Green was not on the scene during the relevant time and had no prior interaction or familiarity with either defendant or the firearm in question. His testimony was based entirely on his lay opinion from watching the video, which we find was impermissible under N.J.R.E. 701. The video was already in evidence, so the jury was able to view the video and determine for themselves what the video showed. As this Court noted in Singh, N.J.R.E. 701 "does not require the lay witness to offer something that the jury does not possess," Singh, 245 N.J. at 19, but the Rule "does not permit a witness to offer a lay opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as he to form a conclusion,'" McLean, 205 N.J. at 459 (alterations in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)).

We hold that Detective Green's testimony invaded the province of the jury by usurping the jury's assessment of the image in the video. The jury was as competent as the detective to view the video and determine what the image did or did not show as to the important issue of the gun's placement. That task was for the jury alone. Accordingly, Detective Green's testimony should not have been allowed.

In reaching that conclusion, without resolving the question here, we do not rule out the possibility of allowing a law enforcement officer to testify

about a sequence in a video that is complex or particularly difficult to perceive. See United States v. Begay, 42 F.3d 486, 502-03 (9th Cir. 1994) (holding that an officer's lay opinion narration of a video depicting over 200 demonstrators engaging in various different types of conduct was helpful to the jury after the officer spent over 100 hours viewing the video); United States v. Torralba-Medina, 784 F.3d 652, 659-60 (9th Cir. 2015) (holding that an officer's lay opinion narration of a video that was difficult to perceive because of the angle of the recording and the numerous nonconsecutive clips did not invade the province of the jury).

The video in this case, however, was not overly complex and did not involve a lot of activity or a chaotic scene that the jury needed assistance viewing. As noted, the video is dark, and the moment when Officer Lee's overhead lights illuminate defendant on the porch and the unknown item is very brief. Officer Lee, who was actually present on scene during the recording, testified that he did not notice a gun until defendant began shooting. The video was in evidence and the jury should have been permitted to view it slowly, frame by frame, to determine for themselves what they saw on screen, without the influence of opinion testimony by an officer who was not there at the time.

41

V.

Lastly, we consider whether it was improper to admit defendant's remote convictions. We review the admission of the convictions for abuse of discretion. See State v. Hedgespeth, 249 N.J. 234, 250 (2021).

A.

N.J.R.E. 609(a) provides that, "[f]or the purpose of attacking the credibility of any witness, the witness' conviction of a crime, subject to [N.J.R.E.] 403, shall be admitted unless excluded by the court pursuant to [N.J.R.E. 609(b)]." N.J.R.E. 609(b)(1), in turn, provides that if, at the time of trial, over 10 years have passed since the conviction or the witness's release from confinement for that conviction, whichever is later, the conviction "is admissible only if the court determines that its probative value outweighs its prejudicial effect, with the proponent of that evidence having the burden of proof."

When deciding whether to admit a witness's prior conviction, trial courts hold a Sands/Brunson hearing. See State v. Sands, 76 N.J. 127 (1978); State v. Brunson, 132 N.J. 377 (1993). Sands inspired the adoption of N.J.R.E. 609 in 1992. See N.J.R.E. 609; Official Comment to N.J.R.E. 609; Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 609 (2022). In Sands, we declared that "[t]he key to exclusion is remoteness" but

42

also noted that "[r]emoteness cannot ordinarily be determined by the passage of time alone." Sands, 76 N.J. at 144.

Prior to the addition of the current section (b) to N.J.R.E. 609 in 2014, N.J.R.E. 609 allowed admission of a witness's conviction of a crime "unless excluded by the judge as remote or for other causes." N.J.R.E. 609 (1993). In 2012, this Court determined the extent to which intervening disorderly persons offenses can justify the admission of a remote conviction that occurred more than 10 years prior to the start of trial. In Derrick Harris, this Court held that a trial court did not abuse its discretion by relying on the defendant's seven intervening disorderly persons offenses to "bridge the gap" between the defendant's earlier criminal convictions and the current case, in order to admit defendant's two 14-year-old convictions. 209 N.J. at 444-45. The dissent expressed the view that, as a matter of law, disorderly persons offenses should not be used to "render proximate otherwise remote criminal convictions." Id. at 447 (Long, J., dissenting).

The Derrick Harris decision referred to the Supreme Court Committee on Evidence possible revisions to N.J.R.E. 609, which led to the 2014 amendment. Id. at 445. That amendment added section (b) to the rule which now allows courts to consider criminal convictions as well as disorderly persons offenses when determining whether to admit remote convictions.

In determining whether evidence of a conviction that occurred over 10 years prior to the start of trial is admissible under N.J.R.E. 609(b)(1), courts may consider the following:

> (i) whether there are intervening <u>convictions</u> for <u>crimes or offenses</u>, and if so, the number, nature, and seriousness of those crimes or offenses,
>
> (ii) whether the conviction involved a crime of dishonesty, lack of veracity or fraud,
>
> (iii) how remote the conviction is in time, [and]
>
> (iv) the seriousness of the crime.
>
> [N.J.R.E. 609(b)(2) (emphases added).]

In recommending the subsequently adopted amendments to N.J.R.E. 609, the Committee noted that "using [disorderly persons offenses] to 'bridge the gap' to a conviction older than 10 years was problematic," but the concern would be best addressed by shifting the burden of admission onto the proponent of the remote convictions. <u>Report of the Supreme Court Committee on the Rules of Evidence</u> (2013). The Committee also expressed the view that "a court may find that a pattern of . . . disorderly persons offenses . . . suffices to meet the burden in a particular context," as reflected in N.J.R.E. 609(b)(2)(i). <u>Ibid.</u>

## B.

Turning to the case before us, four of the prior judgments of conviction at issue occurred 24 years prior to the start of trial, and defendant represents

that he was released from confinement on those convictions 21 years before trial. The final conviction was 14 years old at the time of trial. There is no dispute that more than 10 years had passed since defendant's convictions, as the trial court acknowledged. Pursuant to N.J.R.E. 609(b)(1), the years-old convictions were only admissible if the trial court determined that the probative value of the convictions outweighed their prejudicial effect, with the State bearing the burden of proof. The State argued that defendant's June 2009 disorderly persons offense was sufficient to "bridge the gap" and admit the 24- and 14-year-old convictions.

In considering whether older convictions are admissible, N.J.R.E. 609(b)(2)(i) allows courts to consider "whether there are <u>intervening convictions</u> for crimes or offenses, and if so, the number, nature, and seriousness of those <u>crimes or offenses</u>." (emphases added). Here, although the rule addresses multiple crimes or offenses, the only intervening offense since defendant's last conviction in 2003 was a single disorderly persons offense. In addition, the disorderly persons simple assault matter was not a serious offense. <u>See</u> N.J.S.A. 2C:1-4(b)(1) ("Disorderly persons offenses . . . are not crimes within the meaning of the Constitution of this State."). After his 2003 conviction for unlawful possession of a weapon for which defendant was sentenced to a term of 18 months' probation, defendant did not have any

45

other indictable convictions prior to the present case. The 2009 disorderly persons offense was the only offense to occur in the intervening period. Unlike in <u>Derrick Harris</u>, in which the Court held that the seven intervening disorderly persons offenses were sufficient to bridge the gap and allow admission of the remote convictions, here, there was only one intervening offense which was not serious in nature.

The prior convictions did not involve "dishonesty, lack of veracity, or fraud." <u>See</u> N.J.R.E. 609(b)(2)(ii). The convictions sought to be admitted were certainly remote in time, as one conviction was 14 years old, and the others, as the trial court noted, were "almost a quarter century old." <u>See</u> N.J.R.E. 609(b)(2)(iii). The last factor, regarding the seriousness of the prior convictions, is not disputed; the aggravated assault, controlled dangerous substances offenses, and weapons offenses were all serious crimes. But the seriousness of the prior convictions is not the only inquiry and cannot alone outweigh the prejudicial impact of remote convictions that have nothing to do with dishonesty. And here the only intervening offense is a disorderly persons adjudication that also did not involve a lack of veracity.

Applying the factors in N.J.R.E. 609(b)(2), we hold that it was error for the trial court to admit the remote convictions because the State did not meet

46

its burden of establishing that the probative value outweighed the prejudicial effect of admitting the old convictions.

## VI.

For the foregoing reasons, the decision of the Appellate Division is reversed and the matter is remanded to the trial court for a new trial and further proceedings consistent with this opinion.

CHIEF JUSTICE RABNER; JUSTICES PATTERSON, SOLOMON, WAINER APTER, and FASCIALE; and JUDGE SABATINO (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion.